FILED

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## EASTERN DIVISION

02 NOV 13 PM 3: 57

U.S. DISTRICT COURT
N.D. OF ALABAMA

| | |
|---|---|
| MARKEL INSURANCE COMPANY, a corporation, | ) ) ) |
| Plaintiff/Counterclaim Defendant, | ) ) |
| vs. | ) ) |
| CITY OF LINEVILLE, ALABAMA, a municipal corporation, | ) ) ) |
| Defendant/Counterclaim Plaintiff. | ) ) |

Civil Action No. CV-00-BE-1894-E

ENTERED

NOV 1 3 2002

## MEMORANDUM OPINION

In this diversity action, Markel Insurance Company ("Markel") brings claims for breach of contract and declaratory relief. Markel alleges that the City of Lineville, Alabama (the "City") has failed to pay all amounts allegedly due after Markel, as surety, arranged for the completion of work on a public works contract following default by Markel's principal. On February 21, 2001, the City filed a motion for summary judgment on Markel's claims pursuant to Federal Rule of Civil Procedure 56. (Doc. no. 27). Evidently just for good measure, the City filed another motion for summary judgment on Markel's claims some weeks later. (Doc. no. 40). Now pending before the court are the City's two motions for summary judgment, upon which the parties have submitted evidence and briefs. Upon consideration of the record and the submissions of counsel, the court concludes that the City's motions for summary judgment are due to be granted.

### I. SUMMARY JUDGMENT STANDARDS

On a motion for summary judgment, the court assesses all of the proof the parties can bring to bear to ascertain whether the evidence presents a genuine need for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The court weighs summary judgment heavily

in favor of the non-movant; summary judgment is appropriate only if the court concludes that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A party seeking summary judgment has the initial responsibility of informing the court of the grounds for its motion and specifically identifying those portions of the pleadings, depositions, answers to interrogatories, admissions on file, and any affidavits that it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. *See also Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). Once the moving party has satisfied its initial burden, the nonmoving party must present more than a mere "scintilla" of evidence in support of its claim; rather, the nonmovant must establish that there is sufficient evidence to allow a factfinder reasonably to return a verdict in the non-movant's favor. *See Liberty Lobby*, 477 U.S. at 248, 252.

However, in resolving whether a given factual dispute requires submission to a jury, a district court must view the record in the light most favorable to the nonmoving party and resolve all reasonable inferences in the nonmovant's favor. *Rooney v. Watson*, 101 F.3d 1378, 1380 (11th Cir. 1996) (citing *Hale v. Tallapoosa Co.*, 50 F.3d 1579, 1581 (11th Cir. 1995)). "That is, the court should give credence to the evidence favoring the nonmovant as well as that 'evidence supporting the moving party that is uncontradicted or unimpeached, at least to the extent that that evidence comes from disinterested witnesses.'" *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 151 (2000) (quoting 9A C. Wright & A. Miller, Federal Practice and Procedure § 2529, p.299). Keeping these standards in mind, the court turns to the record in this case.

## II. BACKGROUND[1]

In March 1998, the City issued an invitation to submit sealed bids for a contract to install a new municipal water line system. This water line system was to be installed in accordance with the plans, diagrams, and engineering specifications prepared by Jones, Blair, Waldrup & Tucker ("JBW & T"), a civil engineering firm. The City retained JBW & T as consulting engineers on the project. The contract on the project was a "unit price contract," meaning that each contractor's total bid was calculated as the sum of individual price-per-unit bid amounts for each of 21 specified items of work on a bid schedule, multiplied by quantities of each of those respective items that JBW & T had estimated would be necessary to complete the project. *See* Defendant's Discovery Response Booklet (hereinafter "D-__") at 13-17, 86.

On June 25, 1998, the City awarded the contract to Mountain Movers, L.L.C. ("Mountain Movers"), whose total bid, $221,750.00, was the lowest submitted. Of this amount, $54,000.00 was attributable to Mountain Movers' $90.00 per-linear-foot unit price bid for item 17 on the bid schedule, the complete replacement of asphalt on city streets, multiplied by the 600 linear feet of pavement replacement that JBW & T had estimated would be required on the Project. *See* D-16. When the City accepted Mountain Movers' bid, its total bid amount established the original contract price, and its unit price bid for pavement replacement fixed the unit price for its performance of such work specified in the contract. Pursuant to Alabama law and the contract terms, Mountain Movers furnished performance and payment bonds on the project in favor of the City, with Markel acting

---

[1]"The facts set out below are gleaned from the parties' submission of facts claimed to be undisputed, their respective responses to those submissions, and the court's own examination of the record. These are the 'facts' for summary judgment purposes only. They may not be the actual facts. *See Cox v. Administrator U.S. Steel & Carnegie*, 17 F.3d 1386, 1400 (11th Cir. 1994)." *Underwood v. Life Ins. Co. of Georgia*, 14 F. Supp. 2d 1266, 1267 n.1 (N.D. Ala. 1998).

as the surety on behalf of Mountain Movers. *See* D-30-34.

The parties do not dispute that the plans on the project unambiguously called for a particular portion of the water line to be installed adjacent to a public street known as Knowles Avenue, with the line to be laid behind the existing curb. After beginning construction, however, Mountain Movers encountered unforeseen problems laying the water line along Knowles Avenue in the manner indicated on the plans. Affidavit of Malcolm S. "Sandy" Wadsworth, III, Exhibit 1 to Markel's Memorandum of Law in Opposition to Summary Judgment (doc. no. 49) ("Wadsworth Aff.") ¶ 3. Specifically, Mountain Movers was unable to install the water line in accordance with the plans because not enough room in the right-of-way existed behind the curb, in large part because of the location of existing utilities. Wadsworth Aff. ¶ 3. On or about July 21, 1998, Sandy Wadsworth, the president of Mountain Movers, attended an on-site meeting with Doug Waldrup and John Bowlin, engineers with JBW & T, to discuss where to install the water line on Knowles Avenue. Affidavit of John Samuel Bowlin, II, D-332-34 ("Bowlin Aff.") ¶ 4; Affidavit of Doug Waldrup, D-335-37 ("Waldrup Aff.") ¶ 4. Some dispute exists, however, about what exactly occurred at this meeting.

According to Wadsworth, Bowlin advised him that instead of installing the water line in its planned location adjacent to Knowles Avenue, Mountain Movers should run the line directly under the street itself, approximately two feet from the center line. Wadsworth Aff. ¶ 4. Wadsworth maintains that Bowlin confirmed to him that the City would pay Mountain Movers to do the necessary re-paving of Knowles Avenue based on the unit price for pavement replacement set forth in the contract. *Id.* Wadsworth further alleges that Bowlin requested that Mountain Movers proceed with the Knowles Avenue portion of the project and advised that a change order was not necessary

for Mountain Movers to begin the work. *Id.* ¶ 5. Finally, Wadsworth contends that at no time did anyone discuss competitive bid laws or any need to re-bid the contract before the work could proceed. *Id.*

In contrast, Bowlin and Waldrup claim that Mountain Movers requested to move the water line to an under-the-street location. Bowlin Aff. ¶ 4; Waldrup Aff. ¶ 4. Bowlin and Waldrup do admit, however, that the parties ultimately decided that the water line could be placed under Knowles Avenue. *Id.*; Waldrup Aff. ¶ 4. On the other hand, they deny ever having said that a change order was not necessary, *id.* ¶ 3; Waldrup Aff. ¶ 3. They also claim that they expressed that allowing the installation of the water line under Knowles Avenue was conditioned upon Mountain Movers resurfacing it at a price the City would agree to and benefit from. *Id.* ¶ 4; Waldrup Aff. ¶ 4. They aver that the Mountain Movers representatives agreed to this arrangement. *Id.*; Waldrup Aff. ¶ 4. Finally, the City contends that it subsequently received from Mountain Movers' subcontractor, Hutto Construction Company, Inc. ("Hutto"), a flat price of $8,925.00 to perform the re-paving on Knowles Avenue, and that the City approved this amount. *Id.*; Waldrup Aff. ¶ 4. *See also* D-200.

In any event, Mountain Movers proceeded to dig through a portion of Knowles Avenue and laid the water line beneath the middle of the street, hauling and disposing of large amounts of existing asphalt. Wadsworth Aff. ¶ 6. Thereafter, Mountain Movers performed considerable work preparing the road for re-paving. *Id.* Ultimately, Mountain Movers and its subcontractor, Hutto, replaced the pavement on approximately 700 linear feet of Knowles Avenue. *Id.*[2]

---

[2]Markel suggests in its brief that Hutto simply laid asphalt on top of a roadway base that Mountain Movers had prepared.

On October 28, 1998, JBW & T recommended the issuance of a change order, the third one on the project to that date, for the re-paving work that had been done on Knowles Avenue.[3] D-196. This proposed change order would have adjusted the total contract price by adding $8,925.00, the amount the City claims that Hutto submitted as a flat price for the re-paving work.[4] However, Mountain Movers refused to accept the proposed change order because Wadsworth contended, as he does now, that neither he nor any other representative of Mountain Movers ever agreed to accept $8,925.00 as full payment for moving the water line and re-paving Knowles Avenue. *See* D-196; Wadsworth Aff. ¶¶ 6,7; Bowlin Aff. ¶ 4; Waldrup Aff. ¶ 4. Instead, he expected the City to pay Mountain Movers about $63,000.00 for that work, based on the $90.00 per-linear-foot unit price for pavement replacement set forth in the contract, multiplied by the approximately 700 linear feet of re-paving on Knowles Avenue. Wadsworth Aff. ¶¶ 6, 7. Ultimately, the City and Mountain Movers were unable to reach an agreement on the proposed change order, and neither party ever signed it. D-196.

For reasons that are unimportant here, Mountain Movers ceased work before the project was finished. On December 8, 1998, the City declared Mountain Movers in default, and the City called upon Markel to discharge its obligations under the performance bond it had issued. *See* D-184. In February 1999, the City and Markel entered into a takeover agreement. D-184-91. In that

---

[3]Prior to this time, JBW & T had recommended, Mountain Movers had accepted, and the City had approved two change orders. This first, dated June 3, 1998, involved the substitution of one type of water main pipe for another as well as the addition of one traffic control unit, with such changes adding $14,500 to the total contract price, bringing it from its original $221,750.00 to $236,250.00. D-192. The second change order, which did not alter the contract price, concerned the incorporation of wage rate documents into the contract. D-193-95.

[4]The sum of $8,925 is also the amount of an invoice dated September 8, 1998 that Hutto sent to Mountain Movers for Hutto's re-paving work on Knowles Avenue. *See* D-199.

document, Markel promised to undertake the completion of Mountain Movers' work under the contract, while the City agreed in exchange to pay Markel "the entire unpaid Contract balance, as determined by final measurements and the unit prices set forth in the contract, together with any additional amount of money added to Contract price on account of extra work or changes as the work progresses." Takeover Agreement ¶ 1, D-184-85. Markel hired Hutto to complete the work on the project.

After the project was finished, Markel did not receive all amounts it believed that the City owed. So on July 7, 2000, Markel filed this action, invoking this court's diversity jurisdiction. *See* 28 U.S.C. § 1332. Markel brings claims for breach of contract and declaratory relief, based on allegations that the City still owes it $152,665.86 under the takeover agreement. Markel moved for partial judgment on the pleadings, and, the court entered a partial judgment in favor of Markel in the amount of $46,271.86, stipulating that such entry did not waive any other claims Markel may have against the City. *See* doc. no's 61 & 62. The City now moves for summary judgment, asserting that it does not owe any further amounts to Markel.

### III. DISCUSSION

#### A.   The Parties' Arguments Generally

In support of summary judgment, the City makes two principal arguments. First, the City contends that it would not be required under the terms of the contract to pay any additional compensation to Mountain Movers for the re-paving work on Knowles Avenue because such work was outside the scope of the work delineated in the plans and was not properly authorized under the section of the contract setting forth the conditions under which Mountain Movers was permitted to make changes in the work. Therefore, the City suggests, Markel can fair no better on that issue

under the takeover agreement as Mountain Movers' surety.  And second, the City maintains that, to the extent that the contract or the takeover agreement might obligate the City to pay additional compensation for such work performed by Mountain Movers, those agreements are void and unenforceable because they violate the competitive bid requirements for public works contracts, codified at Title 39 of the Alabama Code. *See* § 39-1-1 *et seq.,* Ala. Code 1975 (2001 Cum. Supp.).

In opposition to the City's arguments, Markel claims that Mountain Movers was, in fact, owed additional compensation for the work in question because the contract allegedly provides that the items of work on the bid schedule, including pavement replacement, were approximations only and that the contractor was entitled to the bid price for any additional amounts of those items that were furnished on the project.  Thus, Markel contends that, pursuant to the takeover agreement,  it is owed such amounts as part of the unpaid contract balance.  Furthermore, Markel urges that even if the City was not bound by the contract to pay Mountain Movers for the extra work performed on Knowles Avenue, the City assumed the obligation to pay Markel for such work under the terms of the takeover agreement.  Finally, Markel contends that Alabama's competitive bid laws do not preclude its recovery for the extra work in question.

The parties devote considerable argument to the effect of the competitive bid requirements of Title 39.  However, the court concludes that the City's motions for summary judgment may be resolved based solely upon the parties' arguments relative to the interpretation of the contract and the takeover agreement.  Thus, the court will not discuss the applicability or effect of Title 39.

**B.      Mountain Movers' Right to Compensation for Extra Work under the Contract**

The City argues that Mountain Movers had no right under the contract to additional compensation for the pavement replacement work on Knowles Avenue and that Markel, as Mountain

Movers' surety, cannot recover such additional compensation, either.  To the extent that Markel asserts in this diversity action that it is owed additional amounts under the contract or the takeover agreement, Alabama law governs all substantive issues.  *See Langston By and Through Langston v. ACT*, 890 F.2d 380, 385 (11th Cir. 1989) (citing *Erie Ry. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938)).  Under that law, if the terms within a contract are plain and unambiguous, construction of the contract and its legal effect are questions of law for the court, and when appropriate may be decided by summary judgment.  *Cabnetware, Inc. v. Birmingham Saw Works, Inc.*, 614 So. 2d 1034, 1038 n.2 (Ala. 1993); *Steward v. Champion Intern. Corp.*, 987 F.2d 732, 734 (11th Cir. 1993).

The contract expressly incorporates JBW & T's plans showing the location and details of the work on the project, and it further provides that Mountain Movers was "forbidden to make any changes or to do any work conflicting [with the plans and drawings] without written approval of [JBW & T]."  Contract § 3.08, D-109.  In addition, the City highlights that the contract states generally that "[a]ll duties, responsibilities and obligations assigned to or undertaken by [Mountain Movers] shall be at [its] expense without changing the contract price," *(i.e.*, "the total compensation payable to [Mountain Movers] for performing the work" under the contract.)  *Id.* § 3.34.1, D-124; *see also id.* § 3.01.11, D-81.  The contract does anticipate certain circumstances under which Mountain Movers would be authorized to make material changes in the work, and the contract also allows that Mountain Movers might be eligible to receive additional compensation for extra work associated with authorized changes.  *See id.* § 3.33, D-123-24.  For changes in the work to be authorized, however, they had to be made pursuant to either a "change order" or a "field order."  *Id.* A "change order" is a "written order to [Mountain Movers] signed by the [City] authorizing an

addition, deletion or revision in the work, or an adjustment in the contract price or the contract time after execution of the agreement." *Id.* § 3.01.9, D-81. A "field order," by contrast, is a "written order issued by [JBW & T] which clarifies or interprets the contract documents or orders minor changes in the work but which does not involve a change in the Contract Price or the Contract Time." Contract § 3.01.19; D-82. However, as the City emphasizes, the contract warns that additional work performed without authorization of a change order would not entitle Mountain Movers to an increase in the contract price except in cases of emergency or except where JBW & T issued a field order for which Mountain Movers made a timely claim for an increase in the contract price pursuant to the terms of § 3.34 of the contract. *Id.* § 3.33, D-124.

JBW & T's plans do not contemplate that Knowles Avenue would be re-paved in conjunction · with the project, as they specify that the water line on that street would be laid behind the existing curb rather than under the street. Indeed, Markel has not disputed that City's evidence indicating that the 600 linear feet of pavement replacement that JBW & T estimated would be required on the project was based upon work associated with the installation of other sections of the water line underneath a different road, Alabama State Highway 9. *See* Bowlin Aff. ¶ 8 ; Waldrup Aff. ¶ 8. Therefore, the court concludes as a matter of law that Mountain Movers' actions in digging up Knowles Avenue, placing the water line directly underneath it, and subsequently re-paving approximately 700 linear feet of that street constitute material deviations from the plans and thus are changes in the work.

The contract prohibits Mountain Movers from determining unilaterally that it would depart from the plans; the contract also provides that if Mountain Movers made changes in the work without obtaining the authorization as required by § 3.33, it was not entitled to any additional

compensation for extra work associated with those changes.  Parties to a contract may prescribe conditions under which they shall be bound, and courts give the words so employed their ordinary and accepted meaning.  *Taylor v. Riley*, 272 Ala. 690, 693, 133 So. 2d 869, 871 (1963).  "Where the contract contains conditions with reference to compensation for extras, the builder must comply with them or he or she has no right to compensation, unless the provision is waived by the owner."  17A C.J.S. *Contracts* § 402 (1999).

The City argues that the evidence shows that the extra work in question that Mountain Movers performed on Knowles Avenue constituted a change in the work that was not properly authorized under § 3.33.  Specifically, the City claims that Mountain Movers did not have a valid change order signed by the City for that work.  Furthermore, the City contends, even if a JBW & T representative told Wadsworth that Mountain Movers should perform the extra work on Knowles Avenue and that the City would pay Mountain Movers therefor based on the unit prices in the contract, as Wadsworth alleges, such an instruction was not sufficient to constitute proper authorization under the contract.  This is so, the City maintains, because § 3.33 of the contract provides that JBW & T, as the engineer, is not permitted to authorize a change in the work if it involves an increase in the contract price.  Thus, the City argues that it is not bound by JBW & T's alleged instruction to Mountain Movers.  And, the City finally contends, because §§ 3.33 and 3.34 of the contract provide that Mountain Movers is not entitled to an increase in the contract price for changes in the work it undertook without obtaining proper authorization, neither Mountain Movers nor Markel as its surety have any right under the contract to further compensation.

In response to the City's foregoing arguments, Markel has not contested the City's assertion that Mountain Movers' pavement replacement on Knowles Avenue was outside the scope of the

work set forth in the plans.  Markel also has not articulated how that work might be deemed an authorized change in the work under the provisions of § 3.33 of the contract.  Nor has Markel disputed that §§ 3.33 and 3.34 generally preclude recovery of additional compensation for unauthorized changes in the work.  While the court concludes that sufficient evidence is present in the record to support the City's assertions on these particular matters, the court notes that it is not entirely certain that no plausible legal or factual arguments exist to contest the City's assertions or its urged application of the contract to the facts of the case.[5]  However, that possibility need not be explored further because Markel has not made such arguments.  "There is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment.  Rather, the onus is upon the parties to formulate arguments; grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned."  *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) (citations omitted).  Thus, the court need only consider the arguments that Markel now offers.

First, Markel relies upon § 3.02.6 of the contract to show that the City owed additional compensation to Mountain Movers for its extra work on Knowles Avenue, and therefore such compensation was also owed to Markel under the takeover agreement as part of the unpaid contract balance.  Section 3.02.6 of the contract provides as follows:

---

[5]For example, Markel has not argued that the terms of the contract entitled Mountain Movers, as a matter of right, to a change order for the work in question.  Markel also has not attempted to explain why the court should interpret JBW & T's verbal instructions to Mountain Movers as adequate authorization within the context of the contract between the City and Mountain Movers.  Nor has Markel raised the issue of whether there might have been an oral modification of the contract or a waiver of the conditions limiting the engineer's authority to make changes.

### 3.02.6 <u>Quantities</u>:

Bidders shall propose a unit price for every item of work named in the proposal. The specified quantities, though determined in advance with as much accuracy as practical, are approximations only; such quantities, however, at the unit price bid for each, shall determine the value of each proposal.

Where additional work is necessary involving an increase in the quantities which are shown in the proposal, the Contractor shall perform such work at prices bid in the proposal and in the same manner as if such work had been included in the original estimate of quantities, and no extra compensation will be allowed for a decrease or increase in these quantities other than unit price bid.

Contract § 3.02.6, D-86-87. Markel contends that, under this section, since the quantities of the items of work on the bid schedule, including pavement replacement, are approximations only, the contract contemplates that Mountain Movers would be compensated for all additional quantities of each identified item it provided, based on the unit prices bid. Thus, Markel makes the straightforward claim that this section entitled Mountain Movers to be paid $90 per linear foot for all pavement replacement it performed in conjunction with the project, including all the pavement replacement on Knowles Avenue, based on the final measurements on the project. The court disagrees.

Markel's failure to confront head-on the City's arguments that Mountain Movers' pavement replacement work on Knowles Avenue was an unauthorized and material change in the work that is not subject to compensation under § 3.33 necessarily forces Markel to place a weight upon § 3.02.06 that the section will not bear. Without doubt, that section provides that when the contractor is performing the work *that is delineated or otherwise authorized by the contract*, he is to perform such work even if it requires him to furnish items of work on the bid schedule in quantities that are in excess of the approximations the engineer estimated would be needed to perform the work. That section further allows that the contractor would be entitled to compensation at the unit price for the

additional quantities of the items he so supplies in performing the work authorized.[6]  However, Markel takes § 3.02.6 to mean much more than that. Markel would have it both automatically authorize the contractor to supply, and entitle him to the unit price for, all quantities of all items of work on the bid schedule that he ultimately furnishes, regardless of whether the contractor has exceeded the scope of the work authorized under the contract.  In other words, Markel suggests that as long as the contract anticipates *some* quantity of pavement replacement as an item of work on the bid schedule, § 3.02.6 authorized Mountain Movers to supply, and entitled Mountain Movers to be paid $90 per linear foot for, *all* quantities of pavement replacement provided, *even those quantities furnished on work that was outside the scope of plans and was not part of an otherwise authorized change.*

Reading the contract as an integrated whole, *see Winkleblack v. Murphy*, 811 So. 2d 521, 527-28 (Ala. 2002), the court declines to adopt such an expansive construction of § 3.02.6, because such a construction contradicts several other specific contractual provisions.  First, construing this section to authorize the contractor unilaterally to supply any amount of any item of work on the bid schedule conflicts with § 3.08, which states that the plans are incorporated into the contract and that

---

[6]For example, the contract plans called for the installation of a portion of the water line directly underneath Alabama Highway 9, and JBW & T had estimated in the bid schedule that such installation work would necessitate approximately 600 linear feet of re-paving work to be done on Highway 9.  Thus, if Mountain Movers had materially complied with the plans and specifications in doing this installation work but the final measurements on the Project showed that Mountain Movers had actually supplied, say, 620 linear feet of pavement replacement on Highway 9, then § 3.02.6 would have authorized such additional pavement replacement, and additional compensation therefor.  However, that scenario is not what happened here.  As explained in the text above, Markel has failed to dispute the City's assertions that Mountain Movers' pavement replacement on Knowles Avenue was *unauthorized* under the contract, because it was outside the scope of the plans and was not sanctioned in accordance with § 3.33 governing allowable changes in the work.

the contractor "is forbidden to make any changes or do any work conflicting" with the plans without written approval of the engineer.  Also, Markel's interpretation of § 3.02.6 would nullify the provisions of § 3.33 setting forth the conditions under which the contractor is permitted to make changes in the work and receive additional compensation therefor, at least insofar as those provisions apply to changes involving any item of work on the bid schedule.  Indeed, under Markel's reading of § 3.02.6, a separate change order or other adjustment to the contract price would *never* be required for any additional quantities of items on the bid schedule because the contractor would have been entitled under § 3.02.6 to provide, and be paid unit price for, all quantities of those items he supplied.  However, this reading cannot be correct because § 3.34.3(A) of the contract expressly anticipates that separate change orders and claims for an increase in the contract price might be based upon additional quantities of items of work covered by the bid schedule.  *See* D-125.  Taken to its conclusion, Markel's interpretation implies that Mountain Movers could have unilaterally decided to extend the scope of the project by, for example, installing the water line system on streets not delineated in the plans or replacing the pavement on any street in the city, and then demanded that City pay unit prices for every item of work supplied.  Given the aforementioned restrictions upon the contractor's authority to deviate from the plans and make changes in the work, the parties to the contract did not intend such a result.

The court concludes that to the extent that Mountain Movers' pavement replacement work on Knowles Avenue was not properly authorized pursuant to the contract, Mountain Movers could not have availed itself of § 3.02.6 to recover additional compensation for that work.  Accordingly, § 3.02.6 is of equally no use to Markel, as Mountain Movers' surety.  Likewise, the court finds that Markel has failed to sufficiently dispute the City's claim that, under the terms and conditions of the

contract, Mountain Movers was not entitled to additional compensation for its extra work on Knowles Avenue.

### C.   Markel's Claim to a Greater Right to Compensation under the Takeover Agreement

Markel also maintains, however, that, regardless of whether Mountain Movers' work on Knowles Avenue was properly authorized or compensable under the terms of the contract itself, the City became liable to pay Markel the unit price in the contract for that work when the City entered into the takeover agreement following Mountain Movers' default. Specifically, Markel relies upon the fact that among the recitals in the takeover agreement is the parties' acknowledgment that "certain work has been completed in excess of the estimated quantities for which payment has not been made by [the City] and which [Markel] is entitled to payment based on the unit prices contained in the contract." D-184. Markel urges that this clause is meant to include the pavement replacement work that Mountain Movers did on Knowles Avenue and that the City thereby assented that it was liable to pay the unit price for such work. In reply, the City argues that this single oblique reference in the takeover agreement does not reasonably manifest an intent on the part of the City to be bound to pay Markel for work on Knowles Avenue that would not have been compensable under the terms of the contract. The court agrees with the City.

The court has not discovered any reported Alabama decision dealing specifically with the operation of a takeover agreement entered into between the government or an owner and the surety of its defaulting contractor-principal under a performance bond. However, sureties and the government commonly enter into such takeover agreements that define their respective rights and obligations in connection with the completion of federal construction contracts. *See, e.g., Employers Ins. of Wausau v. Bright Metal Specialties, Inc.*, 251 F.3d 1316, 1323 (11th Cir. 2001);

*Transamerica Ins. Co. v. United States*, 6 Cl. Ct. 367, 371 (1984); *Carchia v. United States*, 202 Ct. Cl. 723, 735, 485 F.2d 622, 628 (1973).   Generally applicable contract principles that focus upon discerning the parties' intent govern the interpretation of such agreements. *See Transamerica, Ins. Co.,* 6 Cl. Ct. at 371; *Fidelity & Guar. Ins. Co. v. West Point Realty, Inc.*, 2002 WL 1933780, *5 (S.D.N.Y. 2002).

Under Alabama law, the "primary rule of construction is that the court must, if possible, ascertain and give effect to the common intention of the parties, so far as that may be done without contravention of legal principles, statutes, or public policy." *Parr v. Godwin*, 463 So. 2d 129, 132 (Ala. 1984).  To determine this intent, a court must examine more than an isolated sentence or term; it must read each phrase in the context of all other provisions. *Attorneys Ins. Mut. of Alabama, Inc. v. Smith, Blocker & Lowther, P.C.*, 703 So. 2d 866, 870 (Ala. 1996).  Thus, the court discerns the intent of the contracting parties from the whole of the contract. *Homes of Legend, Inc. v. McCollough*, 776 So. 2d 741, 746 (Ala.2000) (citations omitted).  Where nothing indicates that the terms of the contract are used in a special or technical sense, the court will give them their ordinary, plain, and natural meaning. *Id.*

Read in isolation, one might plausibly argue that the recital clause referenced by Markel is at least ambiguous.[7]  Even if Mountain Movers' pavement replacement work on Knowles Avenue

---

[7]The City claims that Markel drafted the takeover agreement and that the court should, therefore, interpret any ambiguity strongly against Markel. *See, e.g., Brewbaker Motors, Inc. v. Belser*, 776 So. 2d 110, 112 (Ala. 2000); *Southern Energy Homes, Inc. v. Washington*, 774 So. 2d 505, 513 (Ala. 2000).  However, the City has raised its allegation that Markel drafted the takeover agreement for the first time in its reply brief, and the City has also failed to support this allegation with any admissible evidence.  As a general rule, the court will not consider arguments raised for the first time in a reply brief, because to do so deprives the non-movant of a fair opportunity to respond. *See United States v. Oakley*, 744 F.2d 1553, 1556 (11th Cir. 1984); *United States v. Georgia Dept. of Natural Resources*, 897 F. Supp. 1464, 1471-72 (N.D. Ga.

was unauthorized and non-compensable under the contract, it still might conceivably be encompassed within the literal terms of the description, "work . . . completed in excess of the estimated quantities for which payment has not been made by [the City] and which [Markel] is entitled to payment based on the unit prices contained in the contract." D-184. Furthermore, courts are to give effect to recitals in a contract, at least to the extent that they can be reconciled with operative or promissory clauses. *City of Birmingham v. I.E. Morris & Associates*, 256 Ala. 273, 277, 54 So. 2d 555, 558 (1951). On the other hand, this recital clause does not inevitably relate to Mountain Movers' pavement replacement work on Knowles Avenue. Neither the clause itself nor any other provision of the takeover agreement specifically mentions pavement replacement work or Knowles Avenue, despite the fact that the City and Mountain Movers had clashed over the latter's work at that location, resulting in the rejection of a proposed change order.

The recital clause Markel cites is not rendered meaningless if the clause is read not to refer to the pavement replacement work at issue. At the time the parties signed the Takeover Agreement, the City had previously approved a change order that had increased the original contract price by $14,500.00, of which $11,600.00 was based upon the addition of some 2,900 linear feet of a certain type of water main "in excess of the estimated quantit[y]" for that item in the bid schedule. *See* D-14, D-192. Likewise, upon the conclusion of the project, the City recognized that, regardless of any dispute about how much pavement replacement work was supplied or was subject to compensation,

---

1995). But even more importantly, the City's statements of fact in a brief, not in proper affidavit form, are not themselves evidence, so the court cannot properly consider them on a motion for summary judgment in determining if a genuine issue of material fact exists. *See Helmich v. Kennedy*, 796 F.2d 1441, 1443 (11th Cir. 1986); *Direct Media Corp. v. Camden Tel. and Tel. Co., Inc.*, 989 F. Supp. 1211, 1217 (S.D. Ga. 1997). Because the record contains no admissible evidence showing who drafted the takeover agreement, the court will not here apply the rule of construction that the City urges.

Markel was entitled to an increase in the contract price of about $16,679.00 based on the unit prices because at least six other of the twenty-one items of work on the original bid schedule had been furnished in quantities in excess of those that JBW & T had estimated at the outset would be necessary.[8] None of these additional quantities or price increases had yet been incorporated into the final contract price when the parties signed the Takeover Agreement. Thus, one may reasonably interpret the recital clause in question as referring simply to some or all of these admittedly authorized additional quantities of items of work on the bid schedule, rather than the extra work done on Knowles Avenue.

Even if the court assumes that the recital clause in question is ambiguous when read in isolation, the court will deem it ambiguous only if it still so appears when considered in the context of the entire takeover agreement. *See Harold Allen's Mobile Home Factory Outlet, Inc. v. Early*, 776 So. 2d 777, 780 n.1 (Ala. 2000); *State Farm Fire & Cas. Co. v. Slade*, 747 So. 2d 293, 309 (Ala. 1999). Thus, the court must examine the rest of the takeover agreement, which provides in pertinent part as follows:

> 1.      Owner [the City] will pay the entire unpaid Contract balance, as determined by final measurements and unit prices set forth in the contract, together with any additional amount of money added to the Contract price on account of extra work or changes as the work progresses. The amount to be paid includes all monies due or to become due contractor [Mountain Movers] arising out of or incidental to

---

[8]The items of work on the bid schedule that the City acknowledged had been properly supplied on the Project in excess of initial estimated quantities included the following: an extra "8" Tapping Sleeve and Valve," adding $2,000 to the contract price under the unit prices (item 7); two extra "Tie End to Existing System," adding $3,000 (item 9); two extra fire hydrants, adding $4,000 (item 11); an extra "1" Service Connection," adding $1,000 (item 14); an extra "3/4" Copper Tubing," adding $600 (item 15); approximately 300 extra cubic yards of "Crushed Stone Backfill," adding $6,079 (item 18). *See* D-203. The City also claimed, however, other items of work on the bid schedule had been supplied on the project in quantities less than those JBW & T had estimated would be needed, offsetting some of the increases. *Id.*

the performance of the Contract, including, but not limited to, unpaid Contract balances including unpaid monies relating to the approved change orders, retained percentages, and monies relating to pending or subsequently submitted change orders approved by the owner [the City]. . . .

. . .

3.    Surety shall perform with all reasonable speed all of the remaining work required by the contractor's Contract, including warranties and guarantees therein contained, in accordance with the terms and conditions of said Contract, . . ., with the exception as to the time of completion. . . .

. . .

8.    Regardless of any claim or contentions which Contractor [Mountain Movers] has made or may make against the Owner [the City] or which the Owner [the City] has made or may make against Contractor [Mountain Movers], the Owner [the City] will fully perform all of the obligations undertaken by it in the Contract and among other things, will make payment to Surety [Markel] of all amounts due or to become due in relation to the Contract as if Surety [Markel] were the original 'contractor' under the Contract.

Takeover Agreement ¶¶ 1, 8, D-184-85, 186.

The City obligated itself in paragraph one, above, to pay the "entire unpaid *Contract* balance" or "*Contract* balances" for work already completed by Mountain Movers. (Emphasis added). The use of the adjective "Contract" to modify "balance" and "balances" reasonably implies that the City is limited to pay an amount that it owed or would have owed to Mountain Movers under the terms and conditions set forth in the contract, had Mountain Movers continued on the Project to its completion.[9]  This plain meaning is corroborated by the subsequent clarifying clause, "The

_____

[9]Markel points out that paragraph 1 of the Takeover Agreement expressly provides that the "Contract balance" is to be "determined by final measurements and unit prices set forth in the contract." Markel takes this language to mean that the City is required to pay unit prices for all quantities of pavement replacement and other items of work that are shown to have been provided in connection with the Project by such "final measurements." However, this claim is merely a related species of Markel's previously rejected argument that § 3.02.6 of the contract obligates the City to pay for all quantities of items of work provided on the project, even those

amount to be paid [to Markel] includes all monies *due or to become due contractor* [Mountain

Movers] arising out of or incidental to the performance of the Contract . . ., "[10] (emphasis added).

Monies would only be "due" the contractor, *i.e.*, Mountain Movers, by virtue of the City's pre-

existing obligations under the contract.  Likewise, in paragraph eight the City promised to "make

payment to Surety of all amounts due or to become due in relation to the Contract as if surety were

the original 'contractor' under the Contract."  Based on the foregoing provisions, the court concludes

that the takeover agreement clearly and unambiguously reveals the parties' intent that Markel would

simply "step into the shoes" of Mountain Movers for purposes of its right to receive compensation

for completing the work on the project.

      The court agrees with the City that the takeover agreement does not grant Markel a greater

right to recover compensation for work already completed than that which Mountain Movers itself

possessed under the terms of the contract.  As already explained, Markel failed to counter the City's

showing that, under the terms and conditions of the contract,  Mountain Movers was not entitled to

be paid any additional amount for its re-paving work on Knowles Avenue because such work was

---

quantities that were not authorized under the terms of the contract.  Irrespective of any
discrepancy between initial estimates and "final measurements" on the project, Markel has failed
to dispute the City's showing that under the terms and conditions of the contract, Mountain
Movers as the original contractor was not entitled to additional compensation for the extra work
on Knowles Avenue because it was not within the scope of the plans and was not a properly
authorized change in the work under § 3.33 of the contract.  Accordingly, compensation for such
unauthorized items cannot be reasonably characterized as part of the "*Contract* balance,"
because it was not due to Mountain Movers under the contract.

      [10]The court notes that the phrase "monies due or to become due contractor arising out of
or incidental to the performance of the Contract" includes "unpaid monies relating to *approved*
change orders . . . and monies relating to pending or subsequently submitted change orders
*approved* by the owner [the City]."  (Emphasis added).  The parties do not dispute, however, that
although JBW & T had proposed a change order for Mountain Movers' pavement replacement
on Knowles Avenue, neither the City nor Mountain Movers ever signed the order.

a material deviation from the work specified in the plans on the Project and was not a properly authorized change in the work under § 3.33 of the contract.  Accordingly, the court concludes, as a matter of law, that the City has shown that Markel cannot prevail on its claims alleging that the City owes Markel additional amounts for such work under the takeover agreement or the contract with Mountain Movers referenced therein.

### III. CONCLUSION

Based on the foregoing, the court concludes that the City has satisfied its burden under Fed. R. Civ. P. 56 to show that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law on Markel's claims.  Therefore, the City's motions for summary judgment on such claims are due to be granted.  The court will enter a separate order.

Done this _13th_ day of November, 2002.

KARON BOWDRE
UNITED STATES DISTRICT JUDGE